IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

DANA MYRICK                                                                                          PLAINTIFF

V.                                                                              NO. 4:13-CV-00050-DMB-JMV

CITY OF INDIANOLA, MISSISSIPPI                                                                DEFENDANT

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION FOR SUMMARY JUDGMENT**

This is an employment discrimination action brought by Plaintiff Dana Myrick against his former employer, the City of Indianola, Mississippi. Plaintiff alleges that the City terminated his employment in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq. Before the Court is the City's motion for summary judgment. Doc. #38.

**I**
**Summary Judgment Standard**

"Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transport A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 22–23 (1986)). To award summary judgment, "[a] court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Id*. at 411–12 (internal quotation marks omitted). To this end, "[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id*. at 412.

"If, as here, the nonmoving party bears the burden of proof at trial, the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 191–92 (5th Cir. 2011) (internal punctuation omitted). When considering a motion for summary judgment, the Court "resolve[s] factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## II
## Relevant Facts

### A. Relevant Persons

Plaintiff Dana Myrick is an African American male who served as Fire Chief of the City of Indianola, Mississippi, from 2010 until 2012. Doc. #1 at Ex. A; Doc. #42-7 at 5; Doc. #42-6 at 9–11. During the time relevant to this lawsuit, the Board of Aldermen of the City of Indianola, which is comprised of five persons,[1] consisted of: (1) Otis Anthony, an African American, who served as Alderman from January 2010 through January 2014, Doc. #42-1 at 4, 6; (2) Carver Randle, an African American, who has served as Alderman since 2010, Doc. #42-2 at 4, 9; (3) Vivian Jenkins, an African American, who served as Alderwoman from

---
[1] Doc. #42-4 at 5.

approximately July 2009 through January 2014, Doc. #42-3 at 4–5; (4) Larry Brown, a white man, who has served as Alderman since approximately 1997, Doc. #42-4 at 4–5; and (5) Gary Fratesi, a white man, who has served as Alderman since approximately 1998, Doc. #42-5 at 4. Steve Rosenthal, a white man, has served as Mayor of Indianola since January 2010. Doc. #42-6 at 8.

### B. Plaintiff's Promotion

When Rosenthal entered office in January 2010, he placed all department heads on probation. Doc. #42-6 at 7–8. At the time, Rufus Powell, a white man, served as the City's Fire Chief. *Id*. Commensurate with Rosenthal's probation initiative, Powell was placed on probation. *Id*.

At the end of the six-month probation period, Rosenthal determined that Powell had failed to correct "some management [and] morale problem[s]." *Id*. at 8. Based on this failure, Rosenthal recommended Powell's termination to the Board. *Id*. at 8–9. The Board unanimously approved Powell's termination. *Id*. at 9. Following Powell's removal, Plaintiff, who was then the Assistant Fire Chief, assumed the role of Interim Chief. *Id*. at 9–10.

After advertising the position of Fire Chief and receiving five applications, Rosenthal recommended that the Board hire Plaintiff. Doc. #42-6 at 9–10. The Board unanimously approved Plaintiff's promotion before the end of its 2010 session.[2] *Id*. at 10–11.

### C. Eugene Snipes

Sometime after his promotion, Plaintiff recommended that Eugene Snipes, an African American man, be appointed to Assistant Chief. Doc. #42-7 at 8–9. Plaintiff testified that after making this recommendation, he was "repeatedly battered and instructed to go back and re-

---

[2] According to Plaintiff, it has "always been tradition that the assistant chief be advanced to the chief position." Doc. #42-7 at 22.

advertise for the position even though … Snipes was the only applicant to put in an application." *Id*. at 16–17. Despite this alleged opposition, Rosenthal did not issue a veto after the Board approved the hiring of Snipes as Assistant Chief. Doc. #42-7 at 19.

Plaintiff testified that Alderman Brown and Alderman Fratesi, who both voted for Snipes to become Assistant Chief, became "upset with [Plaintiff] because [he] did not appoint a white assistant chief." Doc. #42-7 at 5–6, 8. Plaintiff believed this anger stemmed from an unofficial policy of the Board preferring to have a Chief and Assistant Chief of different races.[3] Doc. #42-7 at 6–8. Whatever the reason, in the wake of his recommendation of Snipes, Plaintiff observed that his "job performance started being micromanaged." *Id*. at 8.

### D. Plaintiff's Demotion

In February 2012, Plaintiff traveled to Atlanta to attend a training on grant writing without obtaining approval from the Board or Rosenthal, and without requesting leave for the time off. Doc. #42-7 at 23. When Plaintiff returned from the trip, Rosenthal told him, "you know the procedure[] is that you go through the board and get approved for overnight stay." Doc. #42-6 at 12. Rosenthal also requested paperwork reflecting the subject matter of the training and where Plaintiff stayed while in Atlanta. *Id*. Plaintiff failed to turn in the paperwork and Rosenthal determined that Plaintiff had been absent without leave. *Id*.

As a result of this infraction, Plaintiff was issued a letter of reprimand and demoted one pay grade for "up to six months." Doc. #42-7 at 24; Doc. #42-9. Plaintiff declined to appeal the demotion, and chalked up the discipline to "a bought lesson." Doc. #42-7 at 24.

---

[3] Plaintiff testified that he was told by former Police Chief Charles "Bloatie" Smith that Fratesi told Smith "if the chief was white, they wanted a black assistant [and i]f the chief was black, then they wanted a white assistant." Doc. #42-7 at 6.

4

### E. The Standard Operating Procedures and Leave Requests

Sometime in 2011, before the issue of Plaintiff's Atlanta trip arose, Plaintiff received approval from the Board to revise the Fire Department's standard operating procedures ("SOPs"). Doc. #42-6 at 21–22. Later the same year, Plaintiff submitted to Rosenthal a draft of revised SOPs which Rosenthal described as "just a cookie cutter from another department … that was presented as the draft." *Id*. at 23. In preparing the draft, Plaintiff took "a document ... from a fire department that covers 150 men as compared to 20 [in Indianola and then struck] out the name of the other city." *Id*. at 24. Regarding this draft, Rosenthal explained to Plaintiff that the draft needed to be made "applicable to Indianola." *Id*. at 24–25.

On February 21, 2012, Walter C. Gough, M.D., completed a Certificate to Return to Work or School for Plaintiff. Doc. #42-10. The Certificate provided that "[d]ue to the nature of Mr. Myrick's illness, he can return to work on 03-13-12."[4] *Id*. Plaintiff's doctor apparently intended for the leave to cover thirty days but failed to calculate the time properly. Doc. #42-7 at 24–25. Thus, at 9:26 a.m. on March 12, 2014, Plaintiff sent Rosenthal an e-mail requesting vacation time for March 14, 15, 16, and 19.[5] Doc. #42-11. At 9:43 a.m. the same day, Rosenthal responded that "[a]t this point that request is denied until I am made aware as the status of the SOP's that are due to be presented today." *Id*.

Shortly after his e-mail denying the leave request, Rosenthal received a correction from the doctor regarding the need for additional medical leave. Doc. #42-7 at 25. As a result of this correction, Rosenthal approved the leave request but "wasn't happy about it." *Id*.

At an unspecified time, Gary Austin, Indianola's City Attorney, delivered to Plaintiff a set of SOPs from the Ridgeland Fire Department. Doc. #42-7 at 28. Rosenthal instructed

---

[4] The nature of Plaintiff's illness is not apparent from the record.

[5] Authority over Plaintiff's vacation requests rested with Rosenthal. Doc. #42-7 at 32.

5

Plaintiff "to scratch through anything that [Plaintiff] didn't want in there and to handwrite it and turn it in." *Id*. Plaintiff complied with this instruction. *Id*.

On Monday, March 26, 2012, Plaintiff requested and received Board approval to attend a training from April 2–5 in Pearl, Mississippi. Doc. #42-13. Shortly after the Board approved his travel request, Plaintiff met with Rosenthal and was told "let's get [the SOPs] done before you leave." Doc. #42-6 at 26.

Also on March 26, 2012, Rosenthal, Plaintiff, and Snipes, met regarding the status of the SOPs revisions.[6] Doc. #42-6 at 27. During the meeting, the three men "went over some of the things that needed to be corrected in that document." *Id*. When Plaintiff and Rosenthal met again on Wednesday, March 28, 2012, "almost nothing had been done, nothing had changed." *Id*.

On Thursday, March 29, 2012, Plaintiff submitted another draft to Rosenthal with "no … changes other than rewording of the city and that kind of stuff." Doc. #42-6 at 28. Rosenthal was concerned because Plaintiff failed to account for the fact that Indianola did not "have the manpower as deep as [needed to] implement that document." *Id*. On March 30, 2012, Rosenthal "decided to veto the action o[n Plaintiff's] travel because [the SOPs] needed to be completed somewhat in a presentable state." *Id*.

That same day, Rosenthal sent a letter of veto to the Board.[7] Doc. #42-14. The letter provided in relevant part:

> I am delivering in writing my Veto of the action taken during the meeting of March 26th 2012 pertaining to the travel of Fire Chief Myrick. Chief Myrick at

---

[6] Although Rosenthal testified that the meeting occurred the Monday following the Board meeting, it is undisputed that the Board meeting occurred on March 26, 2012. Doc. #42-13. The Monday following March 26, 2012, is April 2, 2012, when Plaintiff was scheduled to leave.

[7] Pursuant to City policy, the Mayor may veto any Board action. Doc. #42-6 at 28–29. Once a veto has been made, the Board may override the veto with a super majority vote. *Id*. at 29.

6

this time is under a disciplinary action per letter of reprimand dated February 17th, 2012. I chose this punishment rather than suspension so that he could be on the job to finish the S.O.P's as requested by the board more than six months ago. We have many other certified officers who could utilize training. When Chief Myrick comes off this disciplinary action he will have earned the privilege for travel.

*Id*. Rosenthal informed Plaintiff of the veto "after business hours" that evening.[8] Doc. #42-7 at 31.

After learning of the veto, Plaintiff submitted a "vacation request" to Rosenthal and paid for the training himself. Doc. #42-7 at 31–32. Plaintiff submitted this request because he believed he "had done what the mayor … instructed." *Id*. at 32–33. Plaintiff's request was denied on April 1, 2012.[9] Doc. #42-15. Nevertheless, Plaintiff attended the training as planned. Doc. #42-7 at 33.

### F. Plaintiff's Absence and Termination

On April 2, 2012, Rosenthal discovered that Plaintiff had gone to the training. Doc. #42-6 at 30. That day, Rosenthal sent a fax to the Mississippi Fire Academy, the site of the training. Doc. #42-17. The document provided:

> Please instruct Chief Dana Myrick to return to the City of Indianola immediately. Chief Myrick was instructed Friday March 30th that his training session was denied and that he was not to be away from his duties here in the City of Indianola. I expect to see him in my office no later than our call meeting tonight at 7:00 P.M.

*Id*.

Later that day, Rosenthal received a correspondence from the Fire Academy that stated:

> This letter is to confirm the notification given by the Mayor of the City of Indianola to the Fire Chief Dana Myrick. The notification advised Chief Myrick

---

[8] Plaintiff acknowledged that he could have appealed the decision but that such an action would have been futile, insofar as he was supposed to attend training on Monday morning and did not learn of the veto until Friday evening. Doc. #42-7 at 33–34.

[9] It is unclear when Plaintiff was informed of this denial.

7

to return to the city by 7 pm on this date. The Mississippi Fire Academy has advised Chief Myrick two times of the Instructions from Mayor Rosenthal. Chief Myrick has read the letter that was sent to the Fire Academy at 1:30 pm today by the Mayor. Chief Myrick has advised the Academy that he is not leaving the Fire Inspector II Class and that he would address this issue next week once he has completed the class at the Fire Academy.

Doc. #42-17. The letter was signed by Plaintiff and "Instructor Chief Daniel Cross." *Id*.

Following receipt of the Fire Academy letter, Rosenthal convened a "special board meeting" to recommend Plaintiff's termination. Doc. #42-6 at 32. At the meeting, Rosenthal presented to the Board his correspondence with the Fire Academy and Plaintiff's initial draft of the SOPs. *Id*. at 32–33. Rosenthal also recounted his interactions with Plaintiff from the previous week, and explained that Plaintiff "left in direct insubordination of [Rosenthal's] guidance." *Id*. at 33–34.

When Rosenthal completed his presentation, Alderman Brown moved to terminate Plaintiff's employment. Doc. #42-18. The motion was seconded by Alderman Fratesi, and passed with votes from Aldermen Brown, Fratesi, and Randle. *Id*. The remaining Board members, Anthony and Jenkins, voted against the measure. *Id*. The minutes of the April 2, 2012, meeting do not state a reason for the termination. *Id*.

### G. Subsequent Board and Mayoral Action

Following his termination, Plaintiff contacted Aldermen Anthony, Brown, and Jenkins to express his belief that he was "subjected to a hostile environment." Doc. #42-7 at 36–39. During these conversations, Plaintiff explained "why [he] felt like the mayor wouldn't let [him] go to the training even though [he] had completed the task that was given to [him]." *Id*. at 38.

8

On April 23, 2012, Randle, believing then that Rosenthal improperly vetoed Plaintiff's authorization to attend the training,[10] moved to "rescind" the Board's termination of Plaintiff. Doc. #42-19; Doc. #42-2 at 11–12. The motion was seconded by Anthony and passed with votes from Aldermen Randle, Anthony, and Jenkins. Doc. #42-19. Aldermen Brown and Fratesi voted against rescission. *Id*.

On April 26, 2012, Rosenthal sent a notification of veto to the Board. Doc. #42-20. In the notification, Rosenthal explained that "[e]ven though I feel that an improper motion does not need a veto[,] I am vetoing the same for the sake of clarity." *Id*.

"Somewhere within six months" of Plaintiff's termination, the Board promoted Snipes, who had been serving as Interim Chief since Plaintiff's termination, to the position of Fire Chief. Doc. #42-8 at 4–5.

**H. EEOC Charge**

Plaintiff did not appeal his termination because he believed that the Board's vote to rescind the action was "in essence [his] appeal." Doc. #42-7 at 35–36. Rather, on May 2, 2012, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Doc. #1 at Ex. A.

In his charge of race discrimination, Plaintiff alleged:

I am a black person, and have served as fire chief of the City of Indianola for approximately two (2) years. Unfortunately, problems based upon race are causing me to be unable to currently serve in that position. Two white aldermen have become upset with me because I did not appoint a white assistant chief. I appointed the best-qualified person for the job, Eugene Snipes, who is black. The mayor, who is white, wishes to micro-manage my department, rather than letting me perform my duties according to my discretion as fire chief. He recently directed me not to attend a course at the fire academy, even though I was paying for it myself. He initially persuaded one of the three black aldermen to vote with

---

[10] Randle explained that he was concerned "about the time of the veto" and "whether it was done according to law or the time frame or something along those lines." Doc. #42-2 at 10, 12.

9

> him, and had me fired. Subsequently, however, on a 3-2 vote along racial lines, I had been reinstated. Despite my reinstatement, the mayor says he is vetoing that decision, and refuses to permit the board of aldermen to rescind their order firing me. The reason I am not being allowed to serve as fire chief is because of my race (black).

*Id.* Plaintiff received a notice of right to sue from the EEOC on December 13, 2012, and filed this action on March 11, 2013. Doc. #1 at Ex. B.

## III
## Analysis

As mentioned above, Plaintiff's complaint alleges wrongful termination in violation of Title VII and 42 U.S.C. § 1981. Doc. #1 at ¶¶ 11–12. Plaintiff brings his § 1981 claim under the vehicle of 42 U.S.C. § 1983. *Id.* at ¶ 3; *see also Knox v. City of Monroe*, 551 F.Supp.2d 504, 512 (W.D. La. 2008) (noting that "§ 1983 is the vehicle through which [claims under § 1981] are asserted" against a municipality); *Barrett v. Mississippi Dep't of Pub. Safety*, No. 3:11-cv-185, 2013 WL 4015094, at *2 (S.D. Miss. Aug. 6, 2013) ("A claim for race discrimination 'under color of law' by any state governmental entity or official acting in an official capacity may not be brought under § 1981 but rather may be brought, if at all, under § 1983.") (emphasis omitted) (collecting cases).

"Title VII prohibits an employer from discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (quoting 42 U.S.C. § 2000e–2(a)(1)). "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). Section 1983, in turn, provides a cause of action against "[e]very person" who, while acting under color of State law, deprives another person of "any rights,

privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Because "[t]he summary judgment test for discrimination claims under § 1981 and § 1983 is the same as the test for discrimination claims under Title VII," the Court will evaluate Plaintiff's claims together. *Patel v. Midland Mem'l Hosp. and Med. Ctr.*, 298 F.3d 333, 342 (5th Cir. 2002).

A plaintiff may prove unlawful discrimination through either direct or circumstantial evidence. *Nasti*, 492 F.3d at 593. Where a plaintiff relies on circumstantial evidence of race discrimination, his "claims … are evaluated under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805 (1973)." *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 719–20 (5th Cir. 2002). Under this scheme, a plaintiff must first establish a prima facie case of discrimination. *Id.* at 720. If the plaintiff establishes a prima facie case, "a presumption of discrimination arises and … the burden shifts to the defendant to produce a legitimate nondiscriminatory justification for its actions." *Id.* If this burden is met, "the plaintiff is given a full and fair opportunity to demonstrate that the defendant's proffered reason is not true, but instead is a pretext for intentional discrimination." *Id.* (internal quotation marks omitted). Here, Plaintiff seeks to prove discrimination under *McDonnell Douglas*. Doc. #41 at 7.

Generally, to establish a prima facie case of wrongful termination, a plaintiff must show that he: (1) is a member of a protected class; (2) was qualified for the position he held; (3) suffered an adverse employment action; and (4) was replaced with a person who is not a member of the protected class. *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281 (5th Cir. 2004). In its motion for summary judgment, the City concedes the first three elements of the prima facie test but argues that summary judgment is required because Plaintiff cannot show he was replaced with a person outside his protected class. Doc. #39 at 21. Plaintiff responds that, pursuant to the

"work-rule doctrine," the prima facie requirement may be satisfied by showing that he did not commit the act for which he was purportedly fired. Doc. #41 at 8.

### A. The Work Rule Doctrine

Where a plaintiff has been terminated for violation of a "work rule" he "may establish a prima facie case by showing either that he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished similarly." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (internal quotation marks omitted). However, it is axiomatic that for the work-rule doctrine to apply, the plaintiff must have been terminated for violation of a work rule. *Id.*; *see also Thompson v. Cajun Deep Founds., LLC*, No. 3:12-cv-587, 2013 WL 5517901, at *3 (S.D. Miss. Oct. 3, 2013) (work-rule doctrine inapplicable where plaintiff was terminated for unsatisfactory job performance because "performance deficiencies would not qualify as work-rule violations").

Here, it is undisputed that the minutes of the April 2, 2012, Board meeting do not state any reason for Plaintiff's termination. Under Mississippi law "boards of supervisors and other public boards speak only through their minutes." *Urban Developers LLC v. City of Jackson, Mississippi*, 468 F.3d 281, 297 (5th Cir. 2006) (internal quotation marks and emphasis omitted); *see also Thompson v. Jones Cnty. Cmty. Hosp.*, 352 So.2d 795, 796 (Miss. 1977) (collecting cases). "The Mississippi Supreme Court has characterized the minutes requirement as 'an important public policy issue,' cautioning that 'public interest requires adherence thereto, notwithstanding the fact that in some instances the rule may work an apparent injustice.'" *Urban Developers LLC*, 468 F.3d at 299 (quoting *Butler v. Bd. of Supervisors of Hinds Cnty.*, 659 So.2d 578, 579 (Miss. 1995)).

Pursuant to the minutes rule, minutes of a board "are the exclusive evidence of *what* the board did." *Myers v. Blair*, 611 So.2d 969, 972 (Miss. 1992) (emphasis added). Accordingly, "Mississippi law … prohibits the use of extrinsic evidence to prove the intent of the Board's minute entries." *James v. City of Pontotoc*, 364 Fed. App'x 151, 153 (5th Cir. 2010). Thus, in the absence of any indication in the Board minutes that Plaintiff was terminated for cause, the Court is precluded from concluding that Plaintiff's termination was based on violation of a work rule. *Id.; see also Prendergast v. City of Waveland*, __ So.3d __, No. 2013-CA-00555, No. 2014 WL 4413423, at *4 (Miss. Ct. App. Sep. 9, 2014) ("The Board's minutes reflect that Appellants were discharged for budgetary purposes, and 'public boards speak only through their minutes and their actions are evidenced solely by entries on their minutes.'"). Because the Board minutes do not reflect that Plaintiff was terminated for violation of a work rule, he may not invoke the work rule doctrine to alter his prima facie burden.[11] *Thompson*, 2013 WL 5517901, at *3.

### B. Plaintiff's Prima Facie Case

Having found the work-rule doctrine inapplicable, the Court will consider Plaintiff's case under the traditional prima facie standard. Accordingly, Plaintiff must show that he: (1) is a member of a protected class; (2) was qualified for the position he held; (3) suffered an adverse employment action; and (4) was replaced with a person who is not a member of the protected class. *Pegram*, 361 F.3d at 281. As explained above, the City concedes that Plaintiff has met the first three elements. As to the fourth element, it is undisputed that Plaintiff, an African American, was replaced by Snipes, an African American. Thus, Plaintiff cannot establish a

---

[11] In reaching this conclusion, the Court underscores the limited nature of the holding; where minutes of a board do not reflect a termination for cause, neither party may introduce extrinsic evidence to prove otherwise.

prima facie case of race discrimination.  Summary judgment in favor of the City is therefore required.[12]

## IV
## Conclusion

For the reasons above, the Court concludes that Plaintiff cannot establish a prima facie case of race discrimination.  Therefore, the City of Indianola's motion for summary judgment [38] is **GRANTED**.  Additionally, the pending motions in limine [43, 44] are **DENIED as moot.**

SO ORDERED, this the 24th day of September, 2014.

                                            **/s/ Debra M. Brown**
                                            **UNITED STATES DISTRICT JUDGE**

---

[12] In light of this ruling, the court will deny two pending motions in limine [43, 44] as moot.